## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| *In Re* Application of | ) |
|  | ) |
| THE ATTORNEY GENERAL OF | ) |
| THE BRITISH VIRGIN ISLANDS | )   Misc. Case No. _____ |
| P.O. Box 242 | ) |
| Road Town | ) |
| Tortola VG1110 | ) |
| British Virgin Islands | ) |
|  | ) |
| *Applicant* | ) |
|  | ) |
| for Judicial Assistance to Obtain Evidence | ) |
| for Use in a Foreign Proceeding Pursuant | ) |
| to 28 U.S.C. § 1782 | ) |
|  | ) |

## APPLICATION FOR JUDICIAL ASSISTANCE TO OBTAIN EVIDENCE FOR USE IN A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782

The Attorney General of the British Virgin Islands (the "Applicant") respectfully submits this Application for Judicial Assistance to Obtain Evidence for Use in a Foreign Proceeding Pursuant to 28 U.S.C. § 1782 to seek leave to take discovery from parties residing or found in the District of Columbia to obtain documentary and testimony evidence for use in a contemplated proceeding in the British Virgin Islands ("BVI"). In support, the Applicant states as follows:

### INTRODUCTION

1.    The relevant facts to this Application are summarized below and set forth more fully in the Declaration of Martin Kenney ("Declaration") attached as "Exhibit MSK"; the supporting exhibit thereto is "Exhibit MSK-1." The facts stated in the Declaration are incorporated herein by reference.

1

2.      The Applicant seeks the judicial assistance of the United States District Court for the District of Columbia (the "Court") to obtain certain documentary and testimonial evidence in contemplation of civil proceedings to be brought before the courts of the British Virgin Islands ("BVI") against Lester S. Hyman, Esq., a member of the District of Columbia Bar, who represented the BVI Government ("BVIG") in an attorney-client capacity from 1987 to July 30, 2017, as of which date the BVIG terminated Mr. Hyman due to it becoming aware of facts, upon which the BVIG is now contemplating civil proceedings. For the reasons set forth in the Declaration, the Applicant is contemplating bringing a civil action in the BVI against Mr. Hyman for fraud at equity, breach of fiduciary care and loyalty, and negligence. Ex. MSK ¶ 11.

3.      Legal professional ethics rules and case law in the BVI require heightened pleading standards when alleging fraud or dishonesty that must be not only particularized but also supported by cogent evidence. Pleadings failing to comply are liable to be struck as an abuse of process. Id. ¶ 12. Furthermore, due to gravity of the allegations, the Applicant is seeking that investigations and discovery be done diligently to ensure the accuracy of its founding pleading for use before the Eastern Caribbean Supreme Court at the BVI ("BVI High Court").

4.      Within the scope of his legal representation to the BVIG, Mr. Hyman, in late 2013 or early 2014, introduced certain business promoters from the United States to the BVIG. These promoters proposed to start an airline that would operate, for the first time, nonstop commercial flights between Miami and the BVI. Id. ¶ 14. In conjunction with the proposed investment by the promoters, the BVIG was to invest $7,000,000 in the airline. Id. ¶ 34.

5.      Although the BVIG provided the agreed to investment (and an additional $200,000), the airline never went into operation, and the investors apparently never invested any money in the venture before burning up the investment provided by the BVIG. Id. ¶¶ 22 and 46.

6.      Investigations by the BVIG have revealed indicia that, in dereliction of his professional obligations as its attorney to act in the best interest of his client and be free from even the appearance of (let alone actual) conflict of interest, Mr. Hyman personally profited from this failed airline venture by, inter alia, being a paid Director of the failed airline (i.e., a party that was adverse to his client, the BVIG, in the transaction) to the tune of an undisclosed $10,000 director's fee, $2500 for each in-person meeting, and stock options. See ¶ 11, infra. Mr. Hyman was also likely being a paid Director of at least one of the companies that were shareholders of the airline. It also appears that Mr. Hyman secretly received a $200,000 "finder's fee" from the airline and/or its promoters for putting the deal together with the BVIG. Ex. MSK ¶ 10. All this undisclosed improper activity incentivized Mr. Hyman to influence the BVIG to invest what ultimately totaled $7,200,000 into the failed airline venture. As he was being terminated by the BVIG, in an email to the then-Premier of the BVI, Mr. Hyman attempted to recharacterize his role from that of attorney to one as "honest mediator," Id. ¶ 50, a role, to which he acknowledged, in hindsight, the then-Premier of the BVI never agreed. Id. However, in an email two years later to the BVIG's current attorneys who requested the BVIG's client file, see ¶ 10, infra, Mr. Hyman contradicted himself by saying, "[a]t Premier Smith's request, I worked with *both* the BVI Government and BVI Air." Ex. MSK-1 at 153. While he admitted to working with both sides on the transaction, he falsely claimed that it was at the then-Premier's request, which is easily refuted by simply reading Mr. Hyman's own contemporaneous email to the then-Premier. Ex. MSK ¶ 49.

7.      Mr. Hyman's emails from 2014 to 2017 to the then-Premier concerning the failed airline venture reveal an attorney who lost sight of his role as an advocate for his client's interest. Instead, they contain statements of rancor and upset directed to his client in a tone and content calculated to shame, browbeat, and push his client into investing ultimately $7,200,000 of public money in a venture fraught with risk and with parties that the most cursory of due diligence would have revealed red flags that, at a minimum, should have been disclosed to his client since they indicated that the parties were unsuitable for the proposed venture. Id. ¶ 58. In June 2019, when asked by the BVIG's current counsel about the due diligence undertaken and the red flags that current counsel had uncovered, see ¶ 10, infra, without addressing the red flags, Mr. Hyman responded that his due diligence on one of the primary promoters, Bruce Bradley, consisted of asking around (without identifying whom he asked) and that "[a]s a long time official in Massachusetts government (see my bio), I pride myself on my ability in judging people…thus it was with Bruce Bradley," Ex. MSK ¶ 58, (without providing any explanation as to why working as a Massachusetts government official provided a heightened ability to judge persons or why relying on this ability that failed to detect the easy-to-discover red flags was an adequate or reasonable method of conducting due diligence). What was not included in Mr. Hyman's response is how, in an email two years earlier to the then-Premier, Mr. Hyman referred to Mr. Bradley as a "close friend of many years." Id. ¶ 49.

8.      Rather than advising his client or advocating his client's position, Mr. Hyman sent emails to the then-Premier that included, "Frankly, it is very embarrassing to me that, having brought Bruce Bradley to the table, he now receives no reply to his numerous e-mail messages," Id. ¶ 25, or that the BVIG's draft agreement "is unacceptable," Id. ¶ 35, after the BVIG removed the promoters' proposed language that included a sovereign immunity waiver and an

4

anticompetitive restriction on the provision of subsidies to the proposed airline's competitors, legitimate issues of importance for any sovereign that should have been vigorously advocated by its counsel in negotiations with the other side.

9.    In a stunning reflection of this situation, the then-Premier wrote to Mr. Hyman and one of the failed airline's promoters after a conference call with them where they tried to persuade the then-Premier to agree to sign a side letter containing clauses adverse to the BVIG's interests. In that email, he expressed, "I felt all alone in that conference call with you all," Id. ¶ 36, despite having his own attorney on the call.  The record shows that Mr. Hyman pushed his own client hard to enter into the then-proposed airline venture.  In doing so, he put his client into harm's way.  The available evidence suggests that Mr. Hyman did so because he was secretly being paid by the other side.

10.    In June 2019, the BVIG's current attorneys requested the BVIG's client file from Mr. Hyman.  Despite having had the BVIG as a client for thirty years, Mr. Hyman responded that there was no client file nor was any form of written communications ever created because all his meetings were in person or by telephone. Ex. MSK-1 at 153.  As laid out in the Declaration, the veracity of yet another of Mr. Hyman's assertions is again easily refuted, for the BVIG is in possession of many emails and documents between BVIG officials and Mr. Hyman regarding, inter alia, the failed airline venture.

11.    Additionally, when asked by the BVIG's current attorneys about the remuneration that Mr. Hyman received as director of the failed airline venture, he responded to the query by saying that he believed that he was paid about $500. Ex. MSK ¶ 58.  However, the director that the BVIG was entitled to place on the failed airline venture's Board of Directors has provided the email from the failed airline venture that sets out the director's compensation, which included,

inter alia, a payment of $10,000, $2500 per in-person meeting, and stock options.  Ex. MSK-1 at

160.

12.    Since Mr. Hyman appears to be prone to making material misstatements, without

passing judgment as to whether they are intentional or the product of a faulty memory, it is

unfortunately clear that his testimony, even under oath, cannot be solely relied upon as should

ordinarily be expected of a member of the District of Columbia Bar.  Because he had a duty to

disclose his relationships of conflict in this transaction (and failed to do so) and continues to exhibit

a lack of candor (or accuracy) when asked straightforward questions in relation to these

relationships, the scope of the discovery sought by this Application needs to include direct

subpoena access to objective banking, tax, and other similar records in order to reveal the full

scope of facts regarding undisclosed payments received from parties adverse to the BVIG and in

breach of his fiduciary duties.  Therefore, the Applicant respectfully requests the authority to serve

subpoenas for the production of documents that not only include what should form part of the

client file (to which the BVIG is absolutely entitled) but also Mr. Hyman's bank statements, tax

returns, and associated records and communications to test independently any statement by

Mr. Hyman regarding any payments received from any party in connection with the failed airline

transaction that he proposed to the BVIG.

13.    As stated more fully in ¶¶ 45-46, infra, in light of the foregoing, the authority

granted to this Court by § 1782, and the required pleading standards so that it may pursue civil

proceedings in the BVI, the Applicant respectfully requests that the Court exercise its discretion

to grant the Applicant's request to conduct discovery on Mr. Hyman, compelling him to appear

for a deposition in Washington, D.C., to provide testimony with regards to his representation of

the Applicant, his dealings with and the payments he received from the failed airline, its

shareholders and related companies, and the "promoters" and/or "investors" that he introduced to the BVIG. The Applicant further asks that Mr. Hyman be ordered to produce copies of all documentation (whether paper or electronic) in his possession, custody, or control as it relates to his representation of the BVIG, any aspect of his role in the failed airline (including with its investors and related legal entities), financial institution records from 2014 to the present of all accounts in his name or in any legal entity where he has or had a fifty percent or greater legal or beneficial interest, and U.S. federal tax returns from 2014 to 2018.

14.     The Applicant additionally requests discovery for documents from third parties including (1) any information technology professional residing or found in the District of Columbia to include broadly anyone or any entity that has provided information technology services, to include also any such professional that has maintained and/or provided backup services for any computer, server, and/or information technology device, and/or email correspondence, to Mr. Hyman and/or any legal entity, in which he holds or has held a fifty percent or greater legal or beneficial interest at any time since January 1, 2014 (collectively, "IT Professionals"); (2) any financial institution residing in or found in the District of Columbia where Mr. Hyman and/or any legal entity, in which he has held a fifty percent or more legal or beneficial interest at any time since January 1, 2014, has or had an account with respect to account records (collectively, "Banks"); and (3) any income tax advisor or preparer or accountant retained by Mr. Hyman at any time since January 1, 2014, with respect to all communications and other records regarding Mr. Hyman (collectively, "Income Tax Preparers/Advisors/Accountants").

## MEMORANDUM OF AUTHORITIES

## I.     OVERVIEW OF § 1782 AND THE STATUTORY THRESHOLD FOR GRANTING RELIEF

7

15.     "Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 247 (2004). Section 1782 "provide[s] for assistance in obtaining documentary and other tangible evidence as well as testimony." Id. at 248. The statute reads, in pertinent part:

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure. A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

28 U.S.C.A. § 1782(a)

16.     Put succinctly, in order for the Court to be authorized to grant judicial assistance in the form of an order for discovery pursuant to § 1782, the statute sets a mandatory threshold that (1) a person, from whom evidence is sought, reside or be found in the District of this Court; (2) the evidence be for use in a foreign proceeding; and (3) the request be pursuant to a foreign tribunal request or upon application of an interested party.[1]

---

[1] District courts may, and typically do, grant § 1782 relief on an ex parte basis. See In re Masters, 315 F. Supp. 3d 269, 272 (D.D.C. 2018) ("[t]he Court agrees with the applicant that district courts are generally authorized to review a § 1782 application on an ex parte basis"), citing Gushlak v. Gushlak, 486 F. App'x 215, 217 (2d Cir. 2012) ("it is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 ex parte"). "[A]s a general matter, ex parte

## II.   DISCRETIONARY FACTORS

17.   Once the statutory requirements set forth in § 1782 are met, the Court is free to exercise its broad discretion to grant relief. The Court's discretion is guided by the discretionary factors recited by the U.S. Supreme Court in Intel:

> (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," Intel, 542 U.S. at 264, because "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach," Id., and therefore their evidence may be "unobtainable absent § 1782(a) aid," Id.;
>
> (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government, the court, or agency abroad to federal-court judicial assistance," Id.;
>
> (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or the United States," Id., at 264-65; and
>
> (4) whether the § 1782(a) request is "unduly intrusive or burdensome," Id., at 265.

This discretion is further informed by the twin Congressional aims of § 1782 of "'providing efficient means of assistance to participants in international litigation in our federal courts and to encourage foreign countries by example to provide similar means of assistance to our courts.'" Islamic Republic of Pakistan v. Arnold & Porter Kaye Scholer LLP, No. 18-103 (RMC), 2019 WL 1559433 at *6 (D.D.C. Apr. 10, 2019) (citing Intel, 542 U.S. at 252).

### ARGUMENT

## I.   THIS APPLICATION MEETS THE STATUTORY THRESHOLD AUTHORIZING THIS COURT TO GRANT RELIEF

---

review is 'justified by the fact that the parties [from whom discovery is sought] will be given adequate notice of any discovery taken pursuant to the request and will then have the opportunity to move to quash the discovery or to participate in it,'" In re Masters, at 272, citing AG of Hong Kong v. Osman, 138 F.R.D. 27, 32 n.6 (S.D.N.Y. 1991).

18.     As set forth below, this Application meets the statutory requirements authorizing this Court to grant relief pursuant to § 1782.

### A.     Each of the Parties from whom Discovery is Sought Resides or Is Found In This District

19.     Each of the parties from whom discovery is sought reside or are found in the District of Columbia.

#### 1.  Lester Hyman

20.     Lester Hyman is an active member of the District of Columbia Bar in good standing, and his address as listed with the District of Columbia Bar is: 3826 Van Ness St., N.W., Washington, DC 20016, where public records show him the owner of record of the house at that address since January 14, 1976.

#### 2.  IT Professionals

21.     The request for discovery from any IT Professional is explicitly limited to the IT Professional residing or being found in the District of Columbia.

#### 3.  Banks

22.     The request for discovery from any Bank is explicitly limited to it residing or being found in the District of Columbia with respect to any Bank Account of Mr. Hyman, as defined in ¶ 45, infra.

#### 4.  Income Tax Preparers/Advisors/Accountants

23.     The request for discovery from any Income Tax Preparer/Advisor/Accountant that prepared, advised, or assisted in any way with Mr. Hyman's U.S. federal income tax returns for 2014, 2015, 2016, 2017, and/or 2018 is explicitly limited to it residing or being found in the District of Columbia.

### B.  The Evidence Sought is for Use in a Foreign Proceeding

10

24.     The Applicant seeks discovery for use in a contemplated proceeding to be brought before the BVI High Court, the BVI's first instance trial court of unlimited jurisdiction and a foreign tribunal within the meaning of § 1782. See *In re* Ming Yang, No. 19-mc-80207-LB, 2019 WL 4054027, at *1 (N.D. Cal. Aug. 28, 2019) (granting application to serve request for discovery pursuant to § 1782 for a proceeding before the BVI High Court.)

25.     Additionally, it is well settled that a § 1782 application may seek evidence for use in a proceeding that has not yet begun but is within reasonable contemplation.  ("[T]he 'proceeding' for which discovery is sought under § 1782(a) must be in reasonable contemplation, but need not be 'pending' or 'imminent.'" Intel, 542 U.S. at 247).  In the instant case, however, not only is the proceeding within reasonable contemplation, it is also likely to be imminent.  As stated in the Declaration, Martin Kenney is "confident that MKS will be instructed to file proceedings in the BVI against Mr. Hyman as may be reasonably practicable.  I estimate that a claim will be launched within sixty days following the conclusion of discovery hereunder."  Ex. MSK ¶ 78.

## C.     The Applicant Is an Interested Party

26.     The third statutory requirement for § 1782 assistance is that either the request come from a foreign tribunal request or is made by an interested party.  In the instant case, the Applicant intends to initiate proceedings in the BVI as a claimant and seeks to benefit by obtaining monetary damages should it prevail in the contemplated proceeding.

## II.     THE COURT SHOULD EXERCISE ITS DISCRETION IN FAVOR OF GRANTING RELIEF

27.     As noted above, once the District Court has determined that the mandatory requirements for relief under § 1782 are met, the Court is free to grant assistance, including leave for discovery, in its discretion.

A. **First _Intel_ Factor: Whether Persons from whom Discovery Is Sought Are Participants in the Foreign Proceedings**

      **1.**    **Lester Hyman**

28.    While Mr. Hyman is an intended participant of the contemplated proceedings, which at first glance appears to be a factor that would ordinarily weigh against granting § 1782 relief, the rationale underlying the first Intel factor, in fact, weighs in favor of granting § 1782 relief. "[A]lthough 'the need for § 1782(a) aid _generally_ is not as apparent as it ordinarily is when evidence sought from a nonparticipant in the matter arising abroad,' Intel, 524 U.S. at 264, participation in the foreign proceedings does not automatically foreclose § 1782 aid." Gorsoan Ltd. V. Bullock, 652 F. App'x 7, 9 (2d Cir. 2012).

29.    The underlying rationale that "the need for § 1782 aid generally is not apparent," Id., because "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence," Intel, 524 U.S. at 264, is inapplicable in the circumstances of this Application. The BVI High Court does not yet have jurisdiction to compel Mr. Hyman to a deposition or to produce documentation located in the United States. The BVI High Court may exercise jurisdiction over an out-of-jurisdiction party for claims in tort where "the damage was committed within the jurisdiction or the damage was sustained within the jurisdiction," Civ. P. R. 7.3(4), Virgin Is., and it is expected that Mr. Hyman will be subject to the BVI High Court's jurisdiction after the claim is filed. However, as of now, Mr. Hyman is not yet a participant in a proceeding before the BVI High Court and hence is currently a nonparticipant. The heightened pleading standards required under BVI law for claims of fraud or dishonesty, though, necessitate further discovery at this stage simply to get to the point whereby the BVIG can file its claim against Mr. Hyman, thereby becoming a participant in the BVI High Court proceeding.

30.     The Court should, therefore, respectfully consider Mr. Hyman as akin to a nonparticipant because the rationale for the first Intel factor as applied to nonparticipants is present: the BVI High Court cannot yet compel Mr. Hyman to engage in the BVIG's requested discovery. Furthermore, a nonparticipant's "evidence, available in the United States, may be unobtainable absent § 1782(a) aid," Intel, 524 U.S. at 264, factors in favor of granting § 1782 assistance. Here, absent § 1782 assistance, the BVIG faces a circular problem in pursuing its intention to file a claim in the dispute's natural forum, the BVI High Court, because the BVIG cannot properly sue Mr. Hyman absent the required cogent evidence, which in this case is located in the District of Columbia, outside the jurisdiction of the BVI High Court. Absent § 1782 relief, the evidence may never become available to the BVIG because it might never meet its heightened pleading requirement based on cogent objective evidence, thereby never instituting proceedings against Mr. Hyman so that he may become a participant. When taking into consideration the underlying rationale for distinguishing participants from nonparticipants, the analysis for the first Intel factor, as it relates to Mr. Hyman, weighs in favor of granting § 1782 relief.

## 2.     IT                    Professionals,              Banks,           and Income Tax Preparers/Advisors/Accountants

31.     None      of      the      IT      Professionals,       Banks,       and Income Tax Preparers/Advisors/Accountants from whom discovery is sought are expected to be participants in the contemplated foreign proceedings, and none of them are likely to be subject to the jurisdiction of the BVI High Court, such that the BVI High Court could compel these parties for discovery. In fact, not a single bank that has operations in the BVI could in any way be considered to reside or be found in the District of Columbia, and therefore, no readily apparent bank exists that could both reside or be found in the District of Columbia and also be subject to the BVI High Court's jurisdiction. It is also highly unlikely that any IT Professional or

Income Tax Preparer/Advisor/Accountant residing or found in the District of Columbia is also subject to the BVI High Court's jurisdiction. Therefore, the first _Intel_ factor weighs in favor of granting discovery from the Banks and Income Tax Preparers/Advisors/Accountants.

**B. Second _Intel_ Factor: The Nature of the Foreign Tribunal and whether the Foreign Court Is Receptive to U.S. Federal Court Assistance**

32.     As noted in ¶ 24, _supra_, the BVI High Court is the first instance court of unlimited jurisdiction in the BVI, and other U.S. district courts have implicitly recognized the BVI High Court as a foreign tribunal for § 1782 purposes by having granted relief for use in proceedings before the BVI High Court.

33.     The BVI is receptive to U.S. federal court assistance. Where a lacuna in BVI common law exists, the common law of England is extended to the BVI. Common Law (Declaration of Application) Act, 1705, 3 & 4 Ann., c. 13, § 72, Rev. L. Virgin Is. (1991). The leading authority in English law regarding the admissibility of foreign evidence is South Carolina Insurance Co. v. Assurantie Maatschappij "de Zeven Provincien" N.V., [1987] A.C. 24 (H.L.) (appeal taken from Eng.). In South Carolina Insurance, the House of Lords addressed a case where a party had sought and obtained pre-trial § 1782 assistance and found that such assistance does not interfere with the English court's control of proceedings, and evidence procured through § 1782 assistance is admissible. "Under the civil procedure of the High Court the court does not, in general, exercise any control over the manner in which a party obtains the evidence which he needs to support his case." S.C. Ins., [1987] A.C. at 41. "[T]he basic principle underlying the preparation and presentation of a party's case in the High Court in England is that it is for that party to obtain and present the evidence which he needs by his own means, provided always that such means are lawful in the country in which they are used." Id., at 42.

34.     The BVI High Court has implicitly recognized the admissibility of evidence procured with the assistance of § 1782. In a BVI High Court (Commercial Division) judgment criticizing, inter alia, "the defendants' disclosure," Comodo Holdings Ltd. v. Renaissance Ventures Ltd., [2013] BVIHC (Com) 0045/2013 ¶ 271, "[t]he defendants also seem to have opposed, for no very good reason, an application made in the United States by [plaintiff] under 23 [sic] USC § 1782 for the production of documents," Id.

35.     Additionally, accomplishing the second of the twin Congressional aims "of encouraging foreign countries by example to provide similar assistance to our courts," Intel, 542 U.S. at 251 (internal citation omitted), the BVI has legislation like § 1782 in the form of the Evidence (Proceedings in Foreign Jurisdictions) Ordinance. Features of this legislation authorize the BVI High Court, upon application, to compel "(a) the examination of witness, either orally or in writing; (b) the production of documents; (c) the inspection, photographing, preservation, custody or detention of any property; or (d) the medical examination of any person," Evidence (Proceedings in Foreign Jurisdictions) Ordinance, 1988, c. 24, § 4(2), Rev. L. Virgin Is. (1991), in relation to foreign civil proceedings "that have been instituted," Id. § 3(1)(b)(i), or "the institution of which before that court is contemplated," Id. § 3(1)(b)(ii). In short, the BVI High Court is well-versed in and amenable to foreign evidence gathering of the kind sought in this Application for a contemplated proceeding.

36.     Furthermore, Martin Kenney in his Declaration states, "To the extent that this Application is successful, I confirm that any responsive documents disclosed pursuant to this Application will be admissible in the BVI High Court as evidence of Mr. Hyman's wrongs, of which the BVIG now complain." Ex. MSK ¶ 73.

**C. Third *Intel* Factor: Whether this Application Conceals an Attempt to Circumvent Foreign Proof-gathering Restrictions or Other Policies of the Foreign Country or the United States**

37.     This Application does not conceal an attempt to circumvent foreign proof-gathering restrictions or other policies of the foreign country or the United States. On the contrary, as noted in ¶¶ 33-34, supra, and incorporated into the argument in consideration of the third Intel factor, the BVI High Court, in fact, welcomes parties to engage in § 1782 discovery and adopts the English view that litigants control how they gather evidence and may use any lawful means to do so. Additionally, the BVI, with legislation akin to § 1782, has no policy objections to admitting evidence procured through similar legislation elsewhere. However, at this stage prior to the filing of a claim, the BVI High Court does not exercise jurisdiction over any of the U.S. documents and parties, from whom discovery is sought, and defers to U.S. courts to exercise jurisdiction over documents and parties within their territory.

38.     With respect to U.S. policy considerations, the two Congressional aims of assisting foreign litigants and encouraging foreign courts to provide similar assistance to U.S. litigants are met. The Applicant is a foreign litigant of the type that § 1782 is intended to benefit, and the BVI is a jurisdiction that has promulgated similar legislation to assist a similarly placed U.S. litigant. Furthermore, the documentation and testimony sought do not violate U.S. law, practice, or policy concerns; they would be discoverable if the litigation was before U.S. courts. In short, the third Intel factor weighs in favor of granting this § 1782 request.

**D. Fourth Intel Factor: Whether this Application is Overly Burdensome or Intrusive**

        **1.     Lester Hyman**

39.     The testimony and documentation requested of Mr. Hyman is in direct relation to his engagement as attorney to the BVIG for a period of thirty years, with a focus on the period

from 2014 when he introduced Mr. Bradley and others to the BVIG with a proposal to launch direct air service between Miami and the BVI, financed in part by the BVIG. As a member of the District of Columbia Bar, Mr. Hyman is expected to maintain client files for a presumptive period of five years after a matter is closed unless those files are given to the client or his or her successor attorney.   D.C. Bar Legal Ethics Comm., Formal Op. 283 (1998).   Furthermore, the District of Columbia Court of Appeals with regards to attorney disciplinary action has said, "We have previously said that 'a client should not have to ask twice' for his file. We have also said the client is owed an 'immediate return' of his file 'no matter how meager.'" *In re* Toan Q. Thai, 987 A.2d 428, 430 (D.C. 2009).

40.     The BVIG is undoubtedly entitled to its client file, and in a June 20, 2019, letter to Mr. Hyman, the BVIG's current attorneys requested Mr. Hyman's "file (both paper and electronic file including all emails) regarding the above matter [BV Airways Inc. and Associated Companies]." Ex. MSK-1 at 151. In response, on June 23, 2019, Mr. Hyman wrote, "there were no written communications between me and the BVI Government or BVI Air regarding the airport extension matter," Id. at 153, despite the BVIG being in possession of many emails between Mr. Hyman and its officials precisely on this matter.

41.     Furthermore, Mr. Hyman has already stated in an email to the then-Premier, "Some day I'd like to sit down with you and explain my true role in the airport situation," Ex. MSK ¶ 47, thereby not only acknowledging that he has neither fully nor truthfully explained his role in the failed airline venture but also offering to explain it "some day." Id. As Mr. Hyman seems apparently challenged to provide complete and truthful answers and explanations, in the spirit of judicial economy, the Applicant requests to obtain his testimony under oath by way of a deposition instead of continuing to request unsworn and conflicting answers and explanations and is willing

17

to conduct the deposition in Washington, D.C., for the convenience of the deponent. Insofar the discovery sought relates to the client file and evidence related to his representation, all of which a former client is in any event entitled to receive, it cannot be that such a request is considered burdensome or intrusive.

42.     As to the request for discovery of Mr. Hyman's computer/electronic, bank, and income tax records, while recognizing that such records should not ordinarily need to be requested of a member of the District of Columbia Bar, in this instance, Mr. Hyman's own actions while representing his client and his responses to his former client's current attorneys are the causes for the need of this additional evidence. This Court need not evaluate whether Mr. Hyman's history of misstatements to his client and its current attorneys are the result of intentional deceit or innocent forgetfulness. Regardless of the cause, the veracity of Mr. Hyman's statements, even under oath, will, disappointingly for a member of the District of Columbia bar, be under a shadow of doubt. Therefore, because of Mr. Hyman's actions and responses to date, the Applicant is taking the additional step of requesting the discovery of Mr. Hyman's computer/electronic, bank, and tax records from both Mr. Hyman and relevant disinterested third parties to test independently through objective evidence any testimony provided by Mr. Hyman with regards to the BVIG's client file, correspondence from and to him, and payments received by him in connection with his representation of the BVIG, particularly the failed airline venture.

### 2.     IT          Professionals,          Banks,          and Income Tax Preparers/Advisors/Accountants

43.     As to any IT Professional, Bank, or Income Tax Preparer/Advisor/Accountant, the requested discovery should not prove to be overly burdensome or intrusive to the IT Professional, Bank, and/or Income Tax Preparer/Advisor/Accountant because any of the documentation or files requested of any of them will be documentation or files that Mr. Hyman could request and obtain

from his IT Professional, Bank, and/or Income Tax Preparer/Advisor/Accountant. It is simply the identity of the party making the request that is changed from Mr. Hyman to the Applicant, who does not expect that any request of an IT Professional, Bank, and/or Income Tax Preparer/Advisor/Accountant would require the creation of new documents (with the exception of perhaps a cover letter) to comply with the request for discovery. As to these parties, the fourth <u>Intel</u> Factor weighs in favor of granting § 1782 assistance.

## CONCLUSION

44.     The Applicant respectfully submits to the Court that the § 1782 statutory threshold authorizing this Court to grant § 1782 assistance has been met and that the discretionary factors weigh in favor of, in fact, granting an order for discovery as set forth in ¶¶ 45-46, <u>infra</u>.

## RELIEF SOUGHT

45.     The Applicant seeks an order from the Court to grant leave to the Applicant to serve subpoenas <u>duces tecum</u>, compelling the production of:

    a.  From Mr. Hyman:

        i.  His entire client file for the BVIG, which shall also include any documents, correspondence, or any other material that should be in the client file but that Mr. Hyman may not as of yet have included in the client file;

        ii. For the period from January 1, 1987, to the present, copies of all documents (whether in electronic or hard copy form) evidencing, describing, or otherwise mentioning any retainers, letters of engagement, letters of instructions, or any other document setting out the nature of the agreement(s) between Mr. Hyman and the BVIG for the provision of legal advice or other services to the BVIG;

iii.  For the period from September 1, 2013, to the present, copies of all account statements, payment advice slips, checks, wire transfer confirmations, cash receipt slips, or any other financial or other document (whether in electronic or hard copy form) in respect of any Bank Account of Mr. Hyman, infra, including documents or communications of any kind showing information regarding any and all payments or deposits made by electronic funds transfer, banker's draft, check, or cash for the credit of any Bank Account of Mr. Hyman (a "Bank Account of Mr. Hyman" is any account held at any bank, savings and loan association, credit union, securities broker-dealer, or other financial institution that is held in the name or benefit of Mr. Hyman or any legal entity, in which Mr. Hyman holds or has held, directly or indirectly, legally or beneficially, a fifty percent or greater interest);

iv.  For the period from August 1, 2013, to the present, copies of all documents and information (whether in electronic or hard copy form) in Mr. Hyman's possession, custody, or control arising from or in connection with Mr. Hyman's provision of legal or other services to the BVIG including, but not limited to, documents and information relating to the failed airline venture;

v.  For the period from January 1, 1987, to December 31, 2017, copies of all annual reports (or similar) issued by Mr. Hyman to the BVIG that set out a summary of the services rendered by Mr. Hyman in exchange for his $100,000 annual retainer;

      vi.  For the period from August 1, 2013, to the present, copies of all communications (whether in electronic form or hard copy) in Mr. Hyman's possession, custody, or control between Mr. Hyman and any of the enumerated parties in ¶ 46, infra; and

     vii.  For the years 2014, 2015, 2016, 2017, and 2018, copies of all U.S. federal income tax returns (including all schedules to such tax returns) filed by Mr. Hyman as well as a statement setting out a detailed breakdown of the sources, nature, and amounts of income realized by Mr. Hyman in those years;

b.  From any IT Professional:

      i.  Any document, spreadsheet, presentation, email correspondence (whether draft or actually sent or received), or any other electronic file that is part of, or should be part of, Mr. Hyman's client file for the BVIG; and

     ii.  For the period from January 1, 2014, to the present, copies of all documents, spreadsheets, presentations, and other electronic files that were saved at any time during the period and that relate in any way to the BVIG, Mr. Hyman's representation thereof, and/or any of the enumerated parties in ¶ 46, infra, and all email correspondence during the period to or from, or saved as a draft by, Mr. Hyman and/or any person affiliated in any way with any legal entity, in which Mr. Hyman holds or has held directly or indirectly, legally or beneficially, a fifty percent or greater interest, and that relate in any way to the BVIG, Mr. Hyman's representation thereof, and/or any of the enumerated parties in ¶ 46, infra;

    c.  From the Banks:

        i.  For the period from September 1, 2013, to the present, copies of all wire transfer records, debit advices, credit advices, remittance advices, statements of account, correspondence, emails, checks, demand drafts, or any other documents processed or held with respect to any Bank Account of Mr. Hyman;

    d.  From any Income Tax Preparer/Advisor/Accountant who prepared, advised, or assisted with Mr. Hyman's U.S. federal income tax returns and/or related materials for the years 2014, 2015, 2016, 2017, and/or 2018:

        i.  Copies of all correspondence, emails, documents, tax returns, schedules to the same, and any other records in electronic or hard copy form that show the quantum, sources, and nature of Mr. Hyman's income from January 1, 2014, to December 31, 2018.

46.    The Applicant also seeks an order from the Court granting the Applicant leave to serve Mr. Hyman with a subpoena ad testificandum, compelling Mr. Hyman to testify by way of a sworn deposition regarding all matters relating to:

    a.  Any aspect, fact, or other thing arising out of or in any way connected with his representation of the BVIG as its attorney and

    b.  Any aspect, fact, or other thing connected in any way, also including any aspect, fact, or other thing regarding the BVI's and/or Mr. Hyman's communications and relationships, with (i) BV Airways Inc. (the failed airline venture that he proposed to the BVI); (ii) Castleton Holdings LLC; (iii) Colchester Aviation LLC; (iv) Colchester Aviation Ltd.; (v) Raptor Aviation Ltd.; (vi) any of their shareholders

(whether corporate or individual, legal or beneficial), directors, officers, or any other related party or affiliate of them; (vii) Mr. Bradley; (viii) Jamaal Brown; (ix) Adam Frieman; (x) Scott Weisman; (xi) Jerry Willoughby; and/or (xii) any party acting on behalf of, or in conjunction with, any of Messrs. Bradley, Brown, Frieman, Weisman, or Willoughby.

September 19, 2019                          Respectfully submitted,

Markus A. Stadler
D.C. Bar No. 1046805
*Attorney for the Applicant*

MARTIN KENNEY & CO.
P. O. Box 4740
Road Town
Tortola VG1110
British Virgin Islands
(284) 494-2444
mstadler@mksolicitors.com